UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| Michael Orlando, *and the other stockholders of Fit Pay, Inc., with Michael Orlando as Shareholder Representative*, | Case No.: 1:20-cv-01604-MKV |
| Plaintiffs, | **SECOND AMENDED COMPLAINT** |
| v. | **DEMAND FOR JURY TRIAL** |
| Nxt-ID Inc., CrowdOut Capital, LLC, and Garmin International, Inc., | |
| Defendants. | |

Plaintiffs Michael Orlando, and the other stockholders of Fit Pay, Inc., with Michael Orlando as Shareholder Representative ("Fit Pay Shareholders"), by their undersigned counsel, allege for their complaint against Defendants Nxt-ID Inc. ("Nxt-ID"), CrowdOut Capital, LLC ("CrowdOut"), and Garmin International, Inc. ("Garmin") (collectively "Defendants") as follows:

## <u>NATURE OF THE ACTION</u>

1.     Plaintiffs are early investors in Fit Pay, Inc. ("Fit Pay"), one of the most innovative start-ups that few have ever heard of.  After its founding in 2014, Fit Pay achieved early technological and commercial success developing a powerful contactless payment technology.  At present, Fit Pay is single-handedly responsible for the entire suite of technology, banking relationships, and security services that power Garmin Pay, the contactless payment solution provided by Garmin in more than 60 of its devices.  Despite these apparent successes, Fit Pay Shareholders have received almost no return on their initial investment in Fit Pay and

now bring suit seeking redress for the corporate greed and malfeasance of Defendants, which left Fit Pay Shareholders in the cold.

2.      After its early successes, Fit Pay became a highly sought-after strategic partner and ultimately entered into a Merger Agreement with Nxt-ID, a technology services company, on May 23, 2017 (the "Merger Agreement").  Recognizing the value of Fit Pay and its potential for growth, Fit Pay Shareholders negotiated a simple 12.5% earnout payment that was tied to any revenue generated by the Fit Pay technology (the "Earnout Payments").  The Merger Agreement was carefully drafted to provide that the Earnout Payments would survive any future restructuring, acquisition, or sale.

3.      For a time after the merger, Fit Pay Shareholders were optimistic about the deal they had struck with Nxt-ID.  Nxt-ID initially provided Fit Pay with operational support, and Fit Pay continued to generate significant revenue.  And, though Nxt-ID repeatedly requested extensions and delayed making payments, Nxt-ID made repeated assurances that it would comply with its obligations to make Earnout Payments.

4.      In early 2019, things took a dramatic turn for the Fit Pay Shareholders.  Due to a significant misstep by Nxt-ID's Chief Executive Officer, Nxt-ID defaulted on its senior line of credit.  As a result of that default, Nxt-ID was forced to seek a new lender and, out of desperation, took out a $16.5 million loan with a company called CrowdOut, a high-risk online business lender ("CrowdOut Loan").  As part of the deal, CrowdOut demanded that Nxt-ID sell its most valuable asset—Fit Pay—within just sixty days.

5.      Through their representative, Michael Orlando, Fit Pay Shareholders repeatedly reminded CrowdOut and Nxt-ID that the Earnout Payment obligation would survive any sale of Fit Pay.  Both CrowdOut and Nxt-ID made representations to Mr. Orlando that they were aware

of Nxt-ID's obligations to make Earnout Payments under the Merger Agreement and that they would honor those obligations in the event of a sale. Powerless to stop Nxt-ID from taking out the loan, Fit Pay Shareholders had no choice but to rely on CrowdOut's and Nxt-ID's representations.

6.      News of the pressure on Nxt-ID to sell Fit Pay did not take long to reach Garmin, one of Fit Pay's largest existing customers. Garmin had long benefitted from its contractual relationship with Fit Pay, which allowed it to embed Fit Pay's entire suite of contactless payment technology into its devices and offer Garmin Pay to its active consumer base. But, with increasing commercial pressure to compete with Apple and Samsung, Garmin coveted exclusive ownership and dominion over the Fit Pay technology. Garmin now had its opening.

7.      On September 9, 2019, Garmin entered into a Stock Purchase Agreement with Nxt-ID to purchase 100% of Fit Pay's stock for the fire sale price of $3.3 million (the "Garmin SPA"). For years prior to the sale, Garmin had known about the terms of the Merger Agreement, including Nxt-ID's obligation to make Earnout Payments to Fit Pay Shareholders. Not satisfied with having acquired Fit Pay's technology for mere pennies on the dollar, Garmin let corporate greed get the best of it: Garmin negotiated for, and structured, the Garmin SPA to both expressly disclaim any obligation by Garmin to make Earnout Payments to the Fit Pay Shareholders and state that it would refuse to provide any of Fit Pay's revenue information to Nxt-ID, thus preventing Nxt-ID from making any further Earnout Payments to the Fit Pay Shareholders.

8.      Since the execution of the Garmin SPA, Fit Pay has been effectively absorbed by Garmin, which immediately appropriated Fit Pay's technology and cut off all of its contracts with other customers. At long last, Garmin now has the Fit Pay technology all to itself.

9.      To date, Garmin has refused to make any Earnout Payments to Fit Pay Shareholders and has also refused to provide revenue information to Nxt-ID, such that Nxt-ID has failed to make any Earnout Payments.  Nxt-ID is therefore in breach of the Merger Agreement.  Through its egregious conduct, Garmin intentionally interfered with the Merger Agreement and caused such breach, which Nxt-ID has expressly acknowledged.  Further, by powering Garmin Pay, the Fit Pay technology continues to generate millions of dollars in revenue for Garmin that is unjustly enriching Garmin at Fit Pay Shareholders' expense.

10.      CrowdOut, for its part, revealed its true colors after the close of the Garmin SPA. Fit Pay Shareholders had a superior right to the proceeds of the sale due to their entitlement to Earnout Payments, which well exceeded the payout from the sale.  Despite acknowledging this legal right in the CrowdOut Loan agreement and the representations that CrowdOut made to Mr. Orlando, CrowdOut converted the $2,183,265 in proceeds for its own use.  By wrongly taking the proceeds for itself as an early prepayment on the CrowdOut Loan, CrowdOut unjustly enriched itself at the Fit Pay Shareholders' expense.

11.      In the end, Fit Pay Shareholders have been left with nothing.  As a result of Defendants' wrongful and tortious actions, Fit Pay Shareholders have been significantly harmed and prevented from receiving the returns on their initial investment in Fit Pay's innovative technology to which they are legally and equitably entitled.

## PARTIES

12.      Non-Party Fit Pay, Inc. is a Delaware corporation that, at all relevant times, had its principal place of business in California.

13.      Plaintiff Michael Orlando is a citizen of the State of California.  Mr. Orlando represents the Fit Pay Shareholders, who are stockholders of Fit Pay, Inc. that entered into the

Merger Agreement with Nxt-ID and are entitled to Earnout Payments under that agreement. Specifically, as Shareholder Representative, Mr. Orlando represents Michael Walsh, Laura Marion, Chris Orlando, and Brad Snyder, who are citizens of the State of California. Mr. Orlando, as Shareholder Representative, also represents Scott Stevelinck, Benjamin Walford, Steven Kurtz, Brendan Walsh, and Timothy and Nancy Shanahan, who are citizens of the State of Colorado. Mr. Orlando, as Shareholder Representative, further represents J. Michael Bradley, who is a citizen of the State of Utah. Finally, Mr. Orlando, as Shareholder Representative, represents Plug & Play Venture Group, LLC ("Plug & Play"), which is a limited liability company organized under the laws of the State of California with its principal place of business at 370 Convention Way, Redwood City, CA 94063. The members of Plug & Play are citizens of California, and as such, Plug & Play is a citizen of California within the meaning of 28 U.S.C. § 1332(a). Mr. Orlando was designated by the Fit Pay Shareholders to act as Shareholder Representative pursuant to Section 2.13 of the Merger Agreement. As Shareholder Representative, Mr. Orlando is authorized to act as Fit Pay Shareholders' agent and attorney-in-fact and is permitted to take any and all actions required or necessary with respect to the rights of the Fit Pay Shareholders with regard to all matters pertaining to the Merger Agreement. *See* Section 2.13, Merger Agreement.

14.	Defendant CrowdOut Capital, LLC is a limited liability company organized under the laws of the State of Texas with its principal place of business in Texas located at 3001 S. Lamar Boulevard, Austin, Texas 78704. The members of Defendant CrowdOut Capital, LLC are citizens of Texas, Florida, and Connecticut, and as such, CrowdOut Capital, LLC is a citizen of Texas, Florida, and Connecticut within the meaning of 28 U.S.C. § 1332(a).

5

15.     Defendant Nxt-ID Inc. is a Delaware corporation with its principal place of business at 1627 U.S. Highway 1, Unit 206, Sebastian, Florida 32958.

16.     Defendant Garmin International, Inc. is a Kansas corporation with its principal place of business at 1200 E. 151st Street, Olathe, Kansas 66062.  Garmin International, Inc. is a wholly owned subsidiary of Garmin Ltd., which is incorporated in Switzerland with its principal place of business in Schaffhausen, Switzerland.

## JURISDICTION AND VENUE

17.     The Merger Agreement contains a choice of law provision, which provides that the agreement "shall be governed by and construed and enforced in accordance with the internal laws of the State of New York without giving effect to the principles of conflicts of law thereof." Merger Agreement, Section 12.7.

18.     The Merger Agreement also provides that each of the parties "consents to submit itself to the personal jurisdiction in the Federal District Court of the Southern District of New York in the event any dispute arises out of this Agreement or any transaction contemplated hereby."  Merger Agreement, Section 12.11.

19.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332 because the parties are citizens of different states, and the amount in controversy exceeds $75,000.

20.     Venue is proper pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to the claims occurred in this district.

21.     This Court has personal jurisdiction over Defendant Nxt-ID Inc. because, pursuant to the Merger Agreement, Nxt-ID agreed to submit to personal jurisdiction in this Court.  Merger Agreement, Section 12.11.

22.     This Court has personal jurisdiction over Defendant CrowdOut Capital, LLC because it transacts business within New York and has committed tortious acts within New York.  In connection with or as a result of the business it transacts and its tortious acts, CrowdOut negotiated with Nxt-ID in New York, conducted due diligence on Fit Pay in New York, and executed the CrowdOut Loan agreement in New York.

23.     This Court has personal jurisdiction over Defendant Garmin International, Inc. because it transacts business within New York, contracts to supply goods or services within New York, and has committed tortious acts within New York.  In connection with or as a result of the business it transacts, the goods or services it supplies, and its tortious acts, Garmin negotiated and entered into business agreements with Fit Pay in New York, conducted due diligence on Fit Pay as part of negotiating the Garmin SPA in New York, and has profited at the Fit Pay Shareholders' expense through its sale of products in New York.

## FACTUAL ALLEGATIONS

**A.      Fit Pay Develops Powerful Contactless Payment Technology that Rivals Apple Pay and Samsung Pay**

24.     In 2014, Apple revealed "Apple Pay," a technology that would allow its customers to make mobile payments from their Apple watches at contactless payment readers anywhere payments were supported.  Suddenly, Apple watch wearers were able to check out at the grocery store or coffee shop with just a tap of their wrist—no wallet or phone required. Android Pay and Samsung Pay soon followed, allowing these tech giants to provide their customers with the same on-the-go access.  Not to be outdone by its rivals, Garmin followed suit and soon began offering Garmin Pay—the incredible technology that would allow runners, hikers, and other outdoor enthusiasts to buy a bottle of water or extra gear while out on their adventures with just a tap of their Garmin device.

25.     Garmin's ability to offer Garmin Pay was, and to this day still is, dependent on the hard work, dedication, and innovation of Michael Orlando, his co-founders, and a little known company called Fit Pay.  Fit Pay began with a bike ride.  On a warm fall day in 2013, Mr. Orlando and a friend and former colleague at Visa finished a two-hour ride and decided to stop for a drink before heading home.  Unfortunately, Mr. Orlando's debit card was rendered useless by a melted protein bar in his jersey.  Mr. Orlando knew then that there had to be a better, more secure and convenient way to pay for things on-the-go.  At the time, Mr. Orlando was wearing a GPS watch, which tracked his location, the ride time and distance, and even his heart rate and the number of calories he had burned.  Mr. Orlando believed that this information could provide the data to map an identity that would be able to support payment information on any connected device.

26.     Mr. Orlando soon recruited his brother, who had significant business, marketing, and corporate communications experience, and a longtime friend and colleague, who he knew could provide the technological expertise.  Together, they formed the foundation of a team that would set out to develop a ground-breaking application and leave an impact on the payments industry by making every payment transaction convenient, secure, and personalized.

27.     Like many startups before it, Fit Pay began with high aspirations and lofty investor pitches.  Unlike the majority of other start-ups, though, Fit Pay soon attained significant and sustained commercial success and eventually grew into a formidable player in the contactless payment technology industry.  Fit Pay's business model was simple: harnessing its proprietary technology, Fit Pay offered its customers a suite of services in which the customers would be able to embed Fit Pay's technology into their own Internet of Things ("IoT") devices, such as smart watches or phones.  Fit Pay customers would then be able to avail themselves of

Fit Pay's significant relationships with major credit cards, such as Visa, MasterCard, and Discover, and other banking partners. Mr. Orlando drove the development of the relationships with these partners and Fit Pay was soon one of only four companies to have established agreements with the major credit cards and banks that would allow contactless payment transactions to be processed on a nationwide scale. The other companies with such agreements included Apple, Google, and Samsung.

28.     As part of its offerings, Fit Pay provided something called "tokenization" and authentication services, which ensured the security of its transactions. Fit Pay's concept here was unique: through its technology, Fit Pay was able to create unique methods of authentication to identify the user to ensure he/she was the proper owner of a specific form of credential, the model by which to provision or populate a device with that credential, and security protocols to manage the credential throughout its lifecycle.

29.     In addition to making contactless payments, Fit Pay provided backend services for digital wallet creation and management. Finally, Fit Pay's technology also allowed device manufacturers to provide their customers with the ability to access other forms of authenticated transactions. For example, using Fit Pay technology, manufacturers could enable their customers to access public transit systems or secure buildings and complete remote network log-ins, all from a watch or other IoT device.

30.     By offering this suite of technology and services, Fit Pay had built a "one-to-many" delivery model where the company could take a network's digital services and deploy those on any device, operating system, or environment. Fit Pay became the pathway for the networks and their banking partners to more quickly get access to the new markets. Unlike

Apple or Google, who served only their respective users, Fit Pay could partner with any IoT device manufacturer to allow them to provide contactless payment technology.

31.     Fit Pay quickly entered into a number of contracts with device manufacturers that strove to upgrade their consumer experiences to include Fit Pay's powerful new technology. Among them was Garmin, the renowned manufacturer of GPS smart watches, automotive navigation, and outdoor products.  With Apple, Samsung, and Android rolling out contactless payment technology capabilities one after another, Garmin struggled to create its own identity and gain any significant market share against its competitors.  In early 2015, Mr. Orlando was able to get an audience with Garmin's head of product and made the case that Garmin was missing the market and needed to quickly move to launch a competitive and compelling product. Garmin quickly agreed.

32.     By contracting with Fit Pay, Garmin was able to keep up with its competitors by embedding Fit Pay's powerful new capability into its smart watch line.  Garmin's smart watch, equipped with Garmin Pay, is now well known as one of the most complete smart watches on the market for active consumers.

**B.     Fit Pay, Fit Pay Shareholders, and Nxt-ID Enter into a Merger Agreement**

33.     While the start-up was getting off the ground, Mr. Orlando and his co-founders worked unpaid in order to prioritize salaries for the staff software engineers developing Fit Pay's products.  During this time, Fit Pay survived off self-funding from Mr. Orlando and a small group of "friends and family" investors.  Together, this group funded the development of Fit Pay's technology and covered general operational expenses during 2014 and 2015.  These early investors, including the Fit Pay Shareholders and Plaintiffs in this case, believed in Mr.

Orlando's vision and Fit Pay's technology and knew that it could compete on the same stage as Apple, Samsung, and other tech giants.

34.     By early 2017, the Fit Pay Shareholders' faith had started to pay off.  Fit Pay had achieved significant commercial success and began looking into strategic options to further the company's growth.  Around that time, Fit Pay was introduced to Nxt-ID, a technology firm that specialized in the development of personal emergency alert and payment-oriented devices.  Prior to approaching Fit Pay, Nxt-ID had developed a payment device called the Flye Card, which was marketed as "digital credit card" that would be able to store up to ten credit cards, loyalty cards, or debit cards that could be used interchangeably with a "swipe of one's finger."

35.     Although Nxt-ID had already accepted orders for the Flye Card, it had failed to fully develop the card's technological capabilities to initiate a contactless payment transaction and had not adequately ensured the card's security, which was critical to the product's successful launch.  In order to meet its customer orders, and to allow it to continue touting itself as a "comprehensive platform of technology products and services," Nxt-ID sought a merger with Fit Pay.  Fit Pay had already established itself as more than capable of providing the end-to-end contactless payment capabilities, credential management, authentication and secure services, and relationships with payment card networks that Nxt-ID desperately needed.

36.     In May 2017, Fit Pay entered into the Merger Agreement with Nxt-ID and the Fit Pay Shareholders, attached to this complaint as Exhibit A.  The Merger Agreement was drafted in New York and negotiations for the merger were led by Nxt-ID's legal team based in New York.

37.     The Merger Agreement was intended to allow Nxt-ID to acquire Fit Pay's unique payment technology along with the critical business relationships that Fit Pay had developed

with Visa, Mastercard, and their banking partners.  In addition, Nxt-ID would benefit from Fit

Pay's existing lucrative contracts with device manufacturers such as Garmin, which were worth

millions of dollars in future revenue.  For its part, in addition to revenue generated from

incorporating Fit Pay technology into the Flye Card, Fit Pay stood to gain significant operational

capital and support from Nxt-ID.  This support would allow Fit Pay to continue to grow and

thrive in the contactless payments and authentication technology market.

    38.     The Nxt-ID-Fit Pay merger was consummated on May 23, 2017.  In exchange for

acquiring Fit Pay, Nxt-ID provided consideration to Fit Pay Shareholders.  First, Nxt-ID agreed

to provide 22% of the $14.8 million purchase price in restricted common stock of Nxt-ID such

that the Fit Pay Shareholders became Nxt-ID shareholders after the merger.  Second, and most

critically, Nxt-ID agreed to make earnout payments of 12.5% of gross revenue attributed to Fit

Pay's technology and products over the subsequent sixteen fiscal quarters beginning in October

2017 ("Earnout Payments").

    39.     At the time of the merger, the position of the Fit Pay Shareholders was that the

Earnout Payments represented the most significant value and return to Fit Pay's investors

resulting from the merger.  At the time of merger transaction, the Earnout Payments were valued

at $8.1 million.  With confidence in Fit Pay's management team to continue to execute on its

stated strategic plan, these Earnout Payments provided the potential for greater return to the Fit

Pay Shareholders than the historical volatility of Nxt-ID's stock performance.

    40.     The terms of the Merger Agreement are clear on their face and unambiguous in

providing Fit Pay Shareholders with the right to Earnout Payments through 2021.  *See* Section

2.3, "Effect on Capital Stock; Earnout; Payment of Merger Consideration."  Specifically, Section

2.3(b)(i) provides that, from October 1, 2017 through September 30, 2021, Fit Pay Shareholders

are entitled to receive a quarterly Earnout Payment equal to 12.5% of Gross Revenue.  Gross

Revenue is defined in Section 1.1 of the Merger Agreement as "any revenue derived from any

use . . . of the Company Technology."  Company Technology, which is the heart and soul of Fit

Pay, is defined as "software and licenses sufficient to enable secure contactless payments at NFC

[near field communication] capable point of sale terminals, tokenization and authentication

services, and backend services for digital wallet creation and management."  By the clear terms

of the agreement, Fit Pay Shareholders are entitled to 12.5% of any revenue derived from use of

Fit Pay's contactless payment technology from October 1, 2017 through September 30, 2021.

      41.     The Merger Agreement provides that the Earnout Payments are to be made based

on reports of Fit Pay's sales and revenue numbers.  Section 2.3(b)(ii) of the Merger Agreement

requires Nxt-ID to receive Fit Pay's calculation of Gross Revenue for each quarter.  The

agreement provides that Nxt-ID has 10 days after receiving the revenue numbers to raise any

objections and allows for an independent auditor review of disputed revenue numbers.  In the

absence of any dispute, Earnout Payments are to be paid within five days after the calculation of

Gross Revenue.

      42.     The Merger Agreement also requires Nxt-ID to manage Fit Pay in good faith and

prohibits Nxt-ID from doing anything to reduce or eliminate the Earnout Payments.  Section

2.3(b)(iii)(A) of the agreement provides that, "during the Earnout Period[,] [Nxt-ID] shall

manage the ongoing business in good faith and shall not intentionally take any action or fail to

take any action primarily for the purpose of reducing or eliminating the Earnout Payment[.]"

Further, the agreement mandates that "[Nxt-ID] shall use its good faith efforts to manage [Fit

Pay] substantially in the same manner as [Fit Pay was] managed prior to the Closing . . . "  The

Merger Agreement describes good faith efforts as those that involve "consideration of and

decisions made in light of normal business consideration factors, such as profit margins, costs of marketing and sales activities, commercial feasibility, market and technology developments, market acceptance, business opportunities, company resources, competition and competitive advantages and disadvantages, and economic conditions[.]"

43.     The Merger Agreement also explicitly, and unequivocally, mandates that Earnout Payment obligations survive any subsequent restructuring, acquisition or sale.  Specifically, Section 2.3(b)(iii)(A) provides that the Earnout Payment obligations "shall not be modified or decreased" if there is an organizational or operational change that "changes the actual entities that conduct the Business of [Fit Pay] after the Closing."  Making Earnout Payments to the Fit Pay Shareholders is therefore an indisputable, and integral, obligation of Nxt-ID's under the Merger Agreement.

44.     As an early and important customer of Fit Pay, Garmin demanded to be kept fully apprised of Fit Pay's business and its viability as a partner.  To that end, Fit Pay kept Garmin informed about the Nxt-ID merger and, after the Merger Agreement was formally executed, directed Nate Ahuna, Garmin's Director of Business Development and Strategic Partnerships, and Phil McClendon, Garmin's Senior Product Manager, Fitness Segment, to review the public version of the Merger Agreement that Nxt-ID attached to its Form 8-K filed on May 30, 2017. As a result, Garmin knew that, following the merger, Fit Pay Shareholders would receive 12.5% of any revenue derived from Garmin's use of Fit Pay's contactless payment technology from October 1, 2017 through September 30, 2021.

**C.     After the Merger, Fit Pay Continues to Generate Revenue and Nxt-ID Makes Repeated Assurances that It Will Comply with Obligations to Make Earnout Payments**

45.     The Fit Pay-Nxt-ID merger proved instantly beneficial to Nxt-ID.  In the two-year period following the execution of the Merger Agreement, nearly every positive public statement

made by Nxt-ID concerned progress and developments of the Fit Pay technology. These statements served to bolster the investor outlook of the Nxt-ID stock despite Nxt-ID's otherwise unnoteworthy financial performance. For example, in December 2017, the Nxt-ID stock price jumped 320% (from $1.59 to $5.08) due to a new product announcement by Fit Pay. Nxt-ID immediately monetized this sudden increase in value, issuing more than $6.5 million in new shares.

46.     For its part, after the merger, Fit Pay continued to generate substantial revenue, including through its contract with Garmin. And, because Garmin continued to be an important Fit Pay customer after the merger, Fit Pay Shareholders received a significant portion (12.5%) of all revenue generated by Garmin's use of the Fit Pay technology.

47.     Over the coming years after the merger, Fit Pay actively maintained its contract with Garmin. For example, Fit Pay's team repeatedly met with Garmin's product, business development, and marketing teams in New York to discuss partnership terms and integration requirements of adding Mastercard and American Express to the Fit Pay platform. Fit Pay also led negotiations with Garmin and JP Morgan Chase and the three parties ultimately entered into an agreement in which JP Morgan became a banking partner. In addition, Fit Pay and Garmin's product, business development, and marketing teams were in constant communication, collaborating through standing daily calls, frequent meetings, and dedicated instant messaging channels to support Garmin's product launches, including for the successful launch of Garmin's Vivoactive 3 product.

48.     As Fit Pay operations were integrated into Nxt-ID, Fit Pay's management team continued to strive to execute on its strategic plan with operational support from Nxt-ID. And although Nxt-ID faltered in providing Fit Pay with additional revenue opportunities (including

the Flye Card, which ultimately failed to launch), Nxt-ID continued to accept, without disputing, Fit Pay's Gross Revenue calculations.

49.     Nxt-ID made an Earnout Payment on May 5, 2019 in the amount of $156,146.76. Nxt-ID made a subsequent payment on August 30, 2019 in the amount of $27,684.  Gino Pereira, Nxt-ID's Chief Executive Officer at all relevant times, made continuous representations to Mr. Orlando, as Shareholder Representative, that Nxt-ID would make all additional required Earnout Payments under the Merger Agreement.  Throughout this time, Fit Pay Shareholders reasonably expected Nxt-ID to continue to comply with its obligations under the Merger Agreement.

**D.     Nxt-ID Enters into Loan Agreement with High-Risk Online Lender CrowdOut, Putting Fit Pay at Risk and Providing an Opening for Garmin**

50.     Things took a bad turn for Nxt-ID, and, as a consequence, for Fit Pay Shareholders, beginning in late 2018.  Although Fit Pay had initially merged into Nxt-ID as a wholly owned subsidiary, Mr. Pereira began concocting a plan to spin-off Fit Pay into a separate publicly held company.  Upon information and belief, Mr. Pereira did so without proper financing or the ability to capitalize the company in the public markets.  Mr. Pereira announced this ill-conceived plan without the approval of Nxt-ID's senior credit provider, which caused that credit provider to call the outstanding balance of the credit line, which, upon information and belief, was approximately $12.5 million at the time.  This forced Nxt-ID to seek a new lender desperately, which brought Nxt-ID, and later the Fit Pay Shareholders, into the hands of the crowd-sourced, high-risk online business lender, CrowdOut.

51.     In May 2019, Nxt-ID executed the CrowdOut Loan in the amount of $16.5 million in order to refinance its outstanding credit line.  The negotiations for the CrowdOut Loan were led, in significant part, by an investment banking firm, Maxim Group LLC ("Maxim"), based in New York.  Nxt-ID representatives met with Maxim in New York City on multiple

occasions during the negotiation of the CrowdOut Loan documents.  CrowdOut representatives

participated in those meetings.  Further, Nxt-ID engaged a New York-based banker and a New

York-based law firm to help negotiate and execute the CrowdOut Loan documents.

52.     Mr. Pereira directed the negotiations with CrowdOut on Nxt-ID's behalf.  Mr.

Pereira was secretive about these negotiations, often conducting them with no other individuals

from Nxt-ID present and frequently misrepresenting information about the proposed CrowdOut

Loan to the Nxt-ID Board.  Mr. Pereira's conduct in this regard was ultimately revealed to be

part of a larger deceitful pattern.  Fit Pay Shareholders would later learn that, during this time

period, Mr. Pereira transferred 700,000 shares of Nxt-ID stock to his ex-wife as part of a divorce

settlement and failed to disclose that transfer to the Nxt-ID Board or make the proper filings to

the Securities and Exchange Commission.  Fit Pay Shareholders also subsequently learned that

Mr. Pereira had previously defrauded Nxt-ID investors by engaging in a bribery scheme, which

became the subject of a complaint filed by the Securities and Exchange Commission ("Pereira

SEC Complaint").

53.     As part of the CrowdOut Loan terms, CrowdOut demanded that Nxt-ID complete

the proposed spin-off or begin the disposition of the Fit Pay subsidiary within sixty days of

closing.  The relevant CrowdOut Loan document, the credit agreement, is attached to this

complaint as Exhibit B.[1]

54.     The CrowdOut Loan documents required that any proceeds of a sale or

disposition of Fit Pay would be used to prepay the loan *only if* Nxt-ID no longer had obligations

to make the Earnout Payments.  Specifically, Section 6.20(f) of the relevant credit agreement

required Nxt-ID to provide CrowdOut with evidence that "all obligations of any Loan Party

---

[1] This Exhibit reflects the operative agreement between CrowdOut and LogicMark, LLC, a wholly owned subsidiary of Nxt-ID.  The attached version is publicly filed, and thus contains redactions.

[including Nxt-ID] with respect to the Fit Pay Earnout, Fit Pay Merger Agreement, the Promissory Note and the Series C Designation have been assigned and transferred from such Loan Party to a Person that is not a Loan Party nor a Subsidiary of [Nxt-ID]" and that "the Loan Parties [including Nxt-ID] are no longer party to, or obligated with respect to, any of the Fit Pay Earnout, Fit Pay Merger Agreement, the Promissory Note and the Series C Designation."  That is, if Nxt-ID did not provide CrowdOut with evidence that the Earnout Payments had been satisfied, money from the sale of Fit Pay could not be used to prepay the $16.5 million loan. Through their representative, Mr. Orlando, Fit Pay Shareholders relayed their understanding that the CrowdOut Loan documents required that the Earnout Payment obligations be satisfied in connection with a disposition or sale of Fit Pay and that those obligations under the Merger Agreement would survive any sale or disposition of Fit Pay.  Both Nxt-ID and CrowdOut confirmed with Mr. Orlando that the Fit Pay Shareholders' understanding of the CrowdOut Loan documents and surviving nature of the Earnout Payment obligations through the Merger Agreement was correct.

55.    On behalf of Nxt-ID, Mr. Pereira made verbal representations to Mr. Orlando that any disposition of Fit Pay would include the satisfaction of any outstanding and future Earnout Payments due to the Fit Pay Shareholders under the Merger Agreement.  Several of these representations were made to Mr. Orlando by Mr. Pereira during meetings about the proposed spin-off that took place in New York in or around July 2018 and October 2018.

56.    CrowdOut also represented through verbal assurances to Mr. Orlando that any disposition of Fit Pay would include the satisfaction of any outstanding and future Earnout Payments due to the Fit Pay Shareholders pursuant to the Merger Agreement.

18

57.     For example, on July 3, 2019, Nxt-ID failed to comply with the terms of the CrowdOut Loan because it had not completed its disposition of Fit Pay within the required time period.  CrowdOut alerted Nxt-ID of a pending default notification.  Contemporaneously, Nxt-ID defaulted on a Seller's Note due to Mr. Orlando in his individual capacity.  With knowledge of the pending default notification by CrowdOut, Mr. Orlando sent a default notification and demand letter to Nxt-ID in order to preserve his rights provided by the Seller's Note.  In the course of negotiating the resolution of both default notices, CrowdOut negotiated with Mr. Orlando the terms by which the Seller's Note default would be temporarily waived.  As part of these negotiations, CrowdOut made repeated additional assurances that the rights of the Fit Pay Shareholders to the Earnout Payments under the Merger Agreement would be honored in any disposition of Fit Pay.

58.     More specifically, on July 30, 2019, Mr. Orlando spoke by phone with CrowdOut Senior Associate Graham Brown.  During that call, Mr. Orlando conveyed to Mr. Brown Nxt-ID's ongoing obligation to make the Earnout Payments under the Merger Agreement and Mr. Orlando's understanding that, in order to comply with Section 6.20(f) of the relevant credit agreement, CrowdOut must ensure that Nxt-ID's Earnout Payment obligations to the Fit Pay Shareholders were satisfied.  Mr. Brown confirmed Mr. Orlando's understanding of the relevant provisions and represented that CrowdOut would follow the terms and covenants of Section 6.20(f).

59.     On July 31, 2019, in follow-up to their July 30, 2019 phone conversation, Mr. Brown emailed Mr. Orlando, copying Alexander Schoenbaum, CrowdOut's Chief Executive Officer, and Scott Whalen, CrowdOut's Managing Director, and memorialized CrowdOut's assurance that any future transaction concerning Fit Pay would take place "in accordance with

Section 6.20 of the credit agreement." Mr. Brown thus confirmed to Mr. Orlando what he had stated in their earlier call: that any proceeds from a sale of Fit Pay would go to the Fit Pay Shareholders, because that would be necessary in order for CrowdOut to satisfy the Fit Pay obligations, a prerequisite to any additional use of such funds per the express terms of Section 6.20(f).

60.     Mr. Orlando and Mr. Brown further discussed the rights of the Fit Pay Shareholders to the Earnout Payments under the Merger Agreement and Section 6.20(f) during phone calls that took place on August 7, 2019, August 9, 2019, and August 15, 2019. In those discussions, Mr. Brown continued to acknowledge the Fit Pay Shareholders' entitlement to the Earnout Payments and assured Mr. Orlando that CrowdOut would honor those rights following any sale of Fit Pay.

### E.     Garmin Acquires Fit Pay at Fire Sale Price and Exploits Fit Pay Shareholders through the Garmin SPA

61.     News of the CrowdOut Loan and its requirement that Nxt-ID begin the disposition of Fit Pay within 60 days was met by welcome ears at Fit Pay's largest client, Garmin. Until then, although Garmin had continued to profit off Fit Pay's technology, it had been constrained by its contractual relationship with the company. Now, Garmin took the opportunity to seize Fit Pay in its entirety and claim its technology as its own.

62.     Beginning in the Summer of 2019, Garmin began negotiating with Nxt-ID to structure the acquisition of Fit Pay. As part of those negotiations, in July 2019, Garmin pressed Nxt-ID to enter into a letter of intent to secure its presumptive purchase of Fit Pay. While these negotiations were ongoing, Garmin learned that CrowdOut had ordered Nxt-ID to stop funding Fit Pay's operations and, as a result, Nxt-ID was struggling to keep the lights on at Fit Pay. Garmin, thus, offered Nxt-ID a prepayment of $500,000 to entice Nxt-ID to enter into the

Garmin SPA.  All of Garmin's efforts paid off: Garmin and Nxt-ID executed a letter of intent for the sale of Fit Pay on or around August 6, 2019, Garmin wired the $500,000 prepayment on or around August 7, 2019, and the Nxt-ID Board—over Mr. Orlando's dissent—voted to approve the Garmin SPA on September 6, 2019.

63.     On September 9, 2019, Garmin entered into the Garmin SPA, paying just a little more than $3 million to purchase 100% of Fit Pay's stock from Nxt-ID.  The Garmin SPA is attached to this complaint as <u>Exhibit C</u>.[2]  Per the terms of the Garmin SPA, Garmin required that Fit Pay own all of its intellectual property rights free and clear so that Garmin would obtain them through the purchase.  Further, Garmin required disclosure of all contracts through which Fit Pay provided contactless payment technology to other companies so that Garmin would be able to cancel those contracts and shut down any competition.  With the execution of the Garmin SPA, Garmin paid a small fraction of what its competitors paid to develop, implement, and acquire contactless payment capabilities.  For example, in October 2019, Visa International completed an acquisition of a platform similar to Fit Pay's from Rambus for $75 million.

64.     Garmin was not satisfied with having successfully purchased all Fit Pay's stock at a rock bottom price, thereby acquiring Fit Pay's immensely powerful technology and excluding any potential competitors from offering Fit Pay's services.  As Garmin has known since the Merger Agreement was executed in 2017, Fit Pay Shareholders are entitled to 12.5% of all revenue generated by Garmin's use of the Fit Pay technology—an entitlement that would remain valid for *more than two years* following the execution of the Garmin SPA.  So, whereas previously Fit Pay Shareholders received a cut of *Nxt-ID's revenue* that was generated by Garmin as a customer, now Fit Pay Shareholders would receive a cut of *Garmin's revenue* that

---

[2] This Exhibit reflects the publicly filed Garmin SPA and thus contains redactions.

was generated by the Fit Pay technology that Garmin purchased through the Garmin SPA.

Though it was fair and legally required under the Merger Agreement, Garmin could not bear

forfeiting any portion of the lucrative revenue that the Fit Pay technology would generate.

65.     Instead, Garmin unlawfully and improperly disclaimed *any* responsibility or

obligation toward the Fit Pay Shareholders, who remained entitled to their Earnout Payments

under the Merger Agreement.  Specifically, Garmin intentionally negotiated for, and included, a

provision in Section 3.13 of the Garmin SPA, which states that "any and all obligations and

Liabilities related to earn-out or other contingent payments that are or may be payable to the

former shareholders of [Fit Pay] (including any obligations to provide reports regarding sales and

revenues) under the Agreement and Plan of Merger dated as of May 19, 2017 . . . are obligations

and Liabilities of [Nxt-ID], and [Garmin] does as of the Closing and will not following the

Closing have any obligations or Liabilities related to any such earn-out or other contingent

payments."  Per this section, not only did Garmin refuse to assume the Earnout Payment

obligation, it refused to provide any revenue information that would be required for Nxt-ID, or

any other party for that matter, to be able to make the Earnout Payments.

66.     While negotiating the Garmin SPA, Garmin was once again provided, and did

review in detail, the Merger Agreement.  During this due diligence process, Garmin hired Judith

Rinearon of K&L Gates LLP, a New York-based attorney, to evaluate Fit Pay's banking

relationships and other aspects of the Fit Pay business.  In connection with this process,

representatives for Garmin reached out to Fit Pay while doing due diligence on the Garmin SPA

and, on numerous occasions, discussed the terms of the Merger Agreement and other aspects of

Fit Pay's business at that time as well.  Those representatives included Ms. Rinearon, Jeff

Stanton, Garmin's Mergers and Acquisitions Integration Manager, Jim Skillings, Garmin's

Director of Mergers and Acquisitions, Brad Trenkle, Vice President of Garmin's Outdoor segment, and Joshua Maxfield, Garmin's Corporate Associate General Counsel.

67.    On its face, the Merger Agreement makes clear, as Garmin acknowledged through Section 3.13, that Fit Pay Shareholders are entitled to Earnout Payments.  Garmin, by refusing to assume the Earnout Payment obligations and by refusing to provide reports regarding Fit Pay's sale and revenue information, knew that Nxt-ID would breach the Merger Agreement.  With that knowledge, Garmin negotiated for and included Section 3.13 and followed through on its refusal to provide reports regarding sales and revenues and did cause Nxt-ID to breach its obligations under the Merger Agreement.

**F.    After the Close of the Garmin SPA, CrowdOut Takes Off with All Sale Proceeds**

68.    At the close of the Garmin SPA, Fit Pay Shareholders then looked to CrowdOut to honor its obligations under the CrowdOut Loan and follow through on the representations that Mr. Brown and others had made to Mr. Orlando that CrowdOut would satisfy the Earnout Payment obligations and make sure that Fit Pay Shareholders' rights under the Merger Agreement were preserved.  As CrowdOut was well aware, at the time of the Garmin sale, Fit Pay Shareholders were already due past Earnout Payments.  Further, CrowdOut knew that the Merger Agreement specifically identified the additional amount of Fit Pay revenue to which Fit Pay Shareholders' were entitled: 12.5% of Gross Revenue attributable to Fit Pay technology.

Together, the amount due to Fit Pay Shareholders would clearly encompass more than the entire amount of sale proceeds, which equaled $2,183,265.[3]

69.     However, instead of giving Fit Pay Shareholders their money, CrowdOut further revealed its deceptive character and usurped all proceeds from the sale for itself after the close of the Garmin SPA.  In doing so, CrowdOut diverted $2,183,265 in proceeds that legally belonged to the Fit Pay Shareholders.  By taking this money as an unauthorized early prepayment on the CrowdOut Loan, CrowdOut knowingly enriched itself with this money at the Fit Pay Shareholders' expense.

### G.     Garmin Continues to Profit Off Fit Pay Technology at Fit Pay Shareholders' Expense

70.     Garmin continues to profit off the Fit Pay technology that it purchased at a bargain price.  After acquiring Fit Pay's technology, Garmin joined Apple, Google, and Samsung as one of only five companies in the world with a network certified, commercially live tokenized contactless payment capabilities.  These payment capabilities, powered by Fit Pay, enable Garmin to go toe-to-toe with these larger companies in the highly competitive smart watch category by offering Garmin Pay.

71.     One only need to look at Garmin's website to understand the significance of the Fit Pay technology to its current smart watch line.  In boasting about Garmin Pay, the website highlights the capabilities of Fit Pay's contactless payment technology and demonstrates how Garmin continues to profit from it:

---

[3] The sale proceeds were lower than the amount of the sale in part due the prepayment made by Garmin before the close and a payment made on a founder's note.





### Garmin Pay™

Your Garmin device is already an important part of your everyday life, but with Garmin Pay contactless payment solution, you'll have more uses for it than ever before. It's the faster, more secure, convenient way to pay¹.



### Pay for Your Purchases

Garmin Pay is a contactless payment solution designed for people who are always on the move. Whether you grab a cup of coffee after your morning run or get a bite to eat while out on a ride, Garmin Pay lets you make purchases quickly and almost effortlessly with nothing needed but your watch. No wallet? No phone? No problem.



### Quick and Easy to Use

With just a few quick touches, Garmin Pay is easily accessible from your compatible Garmin watch. Enter your passcode, select the right credit card from your virtual wallet, and then hold your wrist near the card reader — that's it. No need to fumble for your phone, cards or cash.

72.     Garmin's website further reveals the reach of Fit Pay's powerful technology, which was developed to be able to access transit lines and perform other contactless tasks.  For

example, the New York City transit system is a "participating" system that, per Garmin's

website, "offer[s] [riders] a smoother experience at the turnstile when [riders] pay per ride with

the credit card information stored on [their] watch."



73.     Garmin's website also touts its expansive network of participating stores and

cooperating banks and credit cards, all of which was only made possible by the relationships that

Fit Pay, through Mr. Orlando, had developed:







74.     These banking relationships include those that Fit Pay helped develop with
Mastercard, JP Morgan Chase, and American Express through meetings with Garmin in New
York.  Specifically, Fit Pay representatives met with Garmin's product, business development,
and marketing teams and Mastercard and American Express in New York City on at least two
occasions in early to mid-2017.

75.     Finally, Garmin's website boasts of the privacy and security features embedded in Garmin Pay—features that were the unique and innovative components of the Fit Pay technology that Garmin bought for mere pennies on the dollar:



### Privacy and Security

Garmin takes the security of your payment information seriously. That's why Garmin Pay protects you by using watch-specific card numbers and transaction codes every time you make a purchase. And your card number is not stored on your device, on our servers or passed to merchants when you pay. So you pay with confidence.

76.     From the Garmin Pay launch through the execution of the Garmin SPA, Garmin's market capitalization grew by nearly $5 billion.  Fit Pay's technology is now included in over 60 of Garmin's devices and is one of the most important features of its line of wearable products.  In fact, the two Garmin business segments that incorporated Fit Pay's technology—Fitness and Outdoor—have grown an average of 25% year-over-year since 2017.  As a result of Garmin's offering of the Fit Pay technology, Garmin's market share has grown to approximately 6% globally, a dramatic rise from the less than 1% market share that Garmin had prior to the introduction of contactless payment capabilities in their products.

77.     Presently, more than a half million (and likely upwards of a million) Garmin customers utilize the Garmin Pay service, which is based entirely on Fit Pay's technology.  A substantial number of those customers are located in New York, where Garmin advertises and sells products through dozens of dealers, sponsors races and other events, and funds major billboard campaigns to support its product launches.

**H.     Nxt-ID and Garmin Refuse to Make Earnout Payments Despite Fit Pay's Continued Commercial Success and Nxt-ID Admits that Garmin Induced its Breach of the Merger Agreement**

78.     Despite Fit Pay's ongoing generation of revenue, which continues to this day, Nxt-ID has refused to make any Earnout Payments since August 2019.

79.     On August 29, 2019, counsel for Fit Pay Shareholders sent Nxt-ID a Notice of Breach and Demand for Payment of outstanding Earnout Payments pursuant to the Merger Agreement.  In this correspondence, counsel for the Fit Pay Shareholders notified Nxt-ID that its failure to make the required Earnout Payment for the quarter that ended June 30, 2019 would constitute a breach of the Merger Agreement and demanded that Nxt-ID make the required payment on or before August 30, 2019.  In addition, counsel stated that Mr. Orlando, as Shareholder Representative, was aware of the pending Garmin SPA, and reminded Nxt-ID that, pursuant to Section 2.3(b)(iii) of the Merger Agreement, Nxt-ID had agreed to manage Fit Pay's ongoing business in good faith, and to not intentionally take any action primarily for the purpose of reducing or eliminating the Earnout Payments owed to the Fit Pay Shareholders.  Counsel also notified Nxt-ID that Mr. Orlando considered any attempt by Nxt-ID to reduce or eliminate future Earnout Payments or to fail to ensure that the Fit Pay Shareholders receive the economic benefits of the Earnout Payments following execution of the proposed Garmin SPA to be a breach of the Merger Agreement.

80.     On August 30, 2019, Nxt-ID made the outstanding Earnout Payment for the quarter that ended June 30, 2019.  On September 5, 2019, on behalf of Nxt-ID, Mr. Pereira responded that Nxt-ID would make no further Earnout Payments following the execution of, and because of, the pending Garmin SPA, thereby admitting that Garmin induced Nxt-ID to breach the Merger Agreement.

81.     On September 6, 2019, counsel for Fit Pay Shareholders notified Nxt-ID that Fit Pay Shareholders intended to take legal action to enforce the terms of the Merger Agreement. Nxt-ID did not respond to this correspondence and has not made any additional Earnout Payments.

82.     Just weeks after Mr. Pereira notified the Fit Pay Shareholders that Nxt-ID would renege on its promises to them, the Fit Pay Shareholders learned that Mr. Pereira had also defrauded Nxt-ID investors by causing Nxt-ID to enter into fraudulent "consulting agreements" through which Mr. Pereira funneled bribes from Nxt-ID's bank account to induce a broker to purchase Nxt-ID stock, when the SEC filed the Pereira SEC Complaint.  Fit Pay Shareholders also learned, per the complaint, that Mr. Pereira frequently used "an end-to-end encrypted and content-expiring messaging application, to conceal and destroy [] communications concerning the [bribery] scheme[.]"[4]

83.     No Earnout Payments have been made by Garmin since the execution of the Garmin SPA in September 2019.  Upon information and belief, Garmin has continued to generate significant revenue from the Fit Pay technology but has not provided Nxt-ID or any other party with access to this revenue information.  Because of Garmin's actions, Nxt-ID has breached the Merger Agreement and has not made any additional Earnout Payments due to Fit Pay Shareholders under the Merger Agreement.

**I.     Conclusion**

84.     While CrowdOut and Garmin have enriched themselves at Fit Pay Shareholders' expense, Plaintiffs are looking only to recoup what they are legally, and equitably, entitled to: the

---

[4] Complaint at ¶15, *SEC v. Pereira*, No. 19-cv-5527 (E.D.N.Y. Sept. 30, 2019).

rightful returns on their initial investment in Fit Pay's innovative technology that continues to power Garmin's market-leading smart watches to this very day.

## CAUSES OF ACTION

### COUNT I
**Breach of Contract**
**(Against Nxt-ID)**

85.     Plaintiffs repeat and re-allege each of the foregoing paragraphs as if fully set forth herein.

86.     The Merger Agreement between Plaintiffs and Nxt-ID is a valid, legally enforceable written agreement.

87.     Plaintiffs have substantially performed their obligations under the Merger Agreement.

88.     In contrast, Nxt-ID, as detailed above, has breached its contractual obligations to Plaintiffs under the Merger Agreement, including but not limited to Section 2.3, which requires Nxt-ID to make Earnout Payments through September 30, 2021.  Nxt-ID has failed to make Earnout payments, which constitutes a material breach of the Merger Agreement.

89.     As a result of Nxt-ID's misconduct and breach of the Merger Agreement, Plaintiffs have sustained damages in an amount to be determined at trial.

### COUNT II
**Conversion**
**(Against CrowdOut)**

90.     Plaintiffs repeat and re-allege each of the foregoing paragraphs as if fully set forth herein.

91.     Pursuant to the terms of the Merger Agreement, Fit Pay Shareholders had the legal right to Earnout Payments in the amount of 12.5% of revenue attributable to Fit Pay's technology.

92.     At the time of the execution of the Garmin SPA, the amount of Earnout Payments to which Fit Pay Shareholders were entitled were in excess of the Garmin sale proceeds and thus the entirety of the sale proceeds in the amount of $2,183,265 were specifically identifiable as money belonging to Fit Pay Shareholders.

93.     Any right to the sale proceeds held by CrowdOut were secondary to Fit Pay Shareholders' immediate superior right of ownership.

94.     After the close of the Garmin sale, CrowdOut assumed unauthorized possession of right to the $2,183,265 sale proceeds to the exclusion of Fit Pay Shareholders' rights.

95.     Based upon the foregoing, Plaintiffs have sustained damages in an amount to be determined at trial.

## COUNT III
### Unjust Enrichment
### (Against CrowdOut)

96.     Plaintiffs repeat and re-allege each of the foregoing paragraphs as if fully set forth herein.

97.     CrowdOut knew that Fit Pay Shareholders were entitled to Earnout Payments under the Merger Agreement.  CrowdOut made verbal representations to Fit Pay Shareholders' representative and included a provision in the CrowdOut Loan document that provided the Earnout Payment obligations were to be satisfied prior to any sale proceeds going toward prepayment of the CrowdOut Loan.  After the close of the Garmin SPA, CrowdOut misappropriated the proceeds to take a prepayment on the CrowdOut Loan.

98.     CrowdOut did so at the Fit Pay Shareholders' expense.

99.     It is against equity and good conscience to permit CrowdOut to retain all of the

Garmin sale proceeds at Fit Pay Shareholders' expense and Fit Pay Shareholders are entitled to

restitution.

**Count IV**
**Tortious Interference with Contract**
**(Against Garmin)**

100.     Plaintiffs repeat and re-allege each of the foregoing paragraphs as if fully set forth

herein.

101.     The Merger Agreement between Nxt-ID and Fit Pay Shareholders constituted a

valid contract.

102.     As described above, Defendant Garmin was aware of the Merger Agreement and

expressly referenced the agreement in the Garmin SPA.

103.     Defendant Garmin knew that Fit Pay Shareholders were entitled to Earnout

Payments under the Merger Agreement.  Garmin also knew that Nxt-ID was required to make

Earnout Payments based on financial and sales and revenue reports related to Fit Pay's business.

104.     With this knowledge, Garmin intentionally negotiated for, and included, a

provision in the Garmin SPA that disclaimed any obligation to assume the Earnout Payments and

also disclaimed any obligation to provide sales and revenue reports related to revenue generated

by the Fit Pay technology.

105.     After the close of the Garmin SPA, Garmin did in fact refuse to make Earnout

Payments and did in fact refuse to provide Fit Pay's revenue information to Nxt-ID.  Garmin

therefore caused Nxt-ID to breach its obligation under the Merger Agreement to make Earnout

Payments to the Fit Pay Shareholders.

106.     As a direct result of Garmin's tortious misconduct, Plaintiffs have sustained

damages in an amount to be determined at trial.

**Count V**
**Unjust Enrichment**
**(Against Garmin)**

107.     Plaintiffs repeat and re-allege each of the foregoing paragraphs as if fully set forth

herein.

108.     Garmin knew that Fit Pay Shareholders were entitled to Earnout Payments under

the Merger Agreement.  Garmin also knew that Nxt-ID was required to make Earnout Payments

based on financial and sales and revenue reports related to Fit Pay's business.  With this

knowledge, Garmin intentionally negotiated for, and included, a provision in the Garmin SPA

that disclaimed any obligation to continue the Earnout Payments after the close of the Garmin

SPA and disclaimed any obligation to provide sales and revenue reports related to revenue

generated by the Fit Pay technology.  Garmin has therefore rendered it impossible for Fit Pay

Shareholders to recover any of the Earnout Payments they are due.

109.     Through its offering of Garmin Pay, Garmin continues to profit off the Fit Pay

technology, which it acquired at a fire sale price, at Fit Pay Shareholders' expense.

110.     It is against equity and good conscience to permit Garmin to continue to retain all

of the revenue attributable to Fit Pay's technology and Fit Pay Shareholders are entitled to

restitution.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief and judgment, including:

      a.  actual, compensatory, and consequential damages, including but not limited to the Earnout Payments, in favor of Plaintiffs and against Defendants in an amount to be determined at trial;

      b.  punitive damages in favor of Plaintiff and against Defendants in an amount to be determined at trial as a result of Defendants' intentional and tortious wrongdoing;

      c.  pre-judgment and post-judgment interest, as allowed by law;

      d.  reimbursement of Plaintiffs' costs and expenses incurred in this action, including reasonable attorneys' fees; and

      e.  such other and further relief as may be just and proper.

## DEMAND FOR JURY TRIAL

    Plaintiffs hereby demand a trial by jury on all claims so triable.

Dated:    New York, New York
           July 30, 2020

                                    WILMER CUTLER PICKERING
                                      HALE AND DORR LLP

                                  By:    */s/ Michael Mugmon*
                                  Michael Mugmon (admitted *pro hac vice*)
                                  One Front Street, Suite 3500
                                  San Francisco, CA 94111
                                  Tel: (628) 235-1000
                                  Fax: (628) 235-1001
                                  michael.mugmon@wilmerhale.com

                                  Jessica L. Lewis (admitted *pro hac vice*)
                                  60 State Street
                                  Boston, MA 02109
                                  Tel: (617) 526-6000
                                  Fax: (617) 526-5000
                                  jessica.lewis@wilmerhale.com

36

Cassandra Mitchell
7 World Trade Center
250 Greenwich Street
New York, NY 10007
Tel: (212) 230-8800
Fax: (212) 230-8888
cassie.mitchell@wilmerhale.com

*Attorneys for Plaintiffs Fit Pay Shareholders*