UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED:_ 3/31/2022 _
```

MICHAEL ORLANDO, *and the other stockholders of Fit Pay, Inc., with Michael Orlando as Shareholder Representative*,

Plaintiffs,

-against-

NXT-ID INC., CROWDOUT CAPITAL, LLC, and GARMIN INTERNATIONAL, INC.,

Defendants.

20-cv-1604 (MKV)

OPINION & ORDER GRANTING
MOTIONS FOR SUMMARY JUDGMENT
AND TO DISMISS COUNTERCLAIMS

MARY KAY VYSKOCIL, United States District Judge:

This is a case about a business relationship that did not work out. Plaintiffs are Michael Orlando and other early investors in non-party Fit Pay, Inc., a contactless payment company. They sold the company to Nxt-ID, Inc., pursuant to a merger agreement, and Nxt-ID later sold Fit Pay to Garmin International, Inc. as a condition of a loan from CrowdOut Capital, LLC. Plaintiffs initiated this action against all three defendants after Nxt-ID stopped paying Plaintiffs a percentage of the revenue produced by Fit Pay after Nxt-ID had sold Fit Pay to Garmin. Nxt-ID responded with a number of counterclaims against Orlando, alleging that he misrepresented the earning potential of Fit Pay and did not act in the best interest of Nxt-ID after the merger. The Court granted earlier motions by Garmin and CrowdOut to dismiss Plaintiffs' claims against them. Now before the Court are the motion of Nxt-ID for summary judgment on Plaintiffs' claim for breach of the merger agreement [ECF No. 105] and Plaintiffs' motion to dismiss the counterclaims against Orlando [ECF No. 88]. Orlando and Nxt-ID found themselves at cross-purposes. But neither acted unlawfully. Accordingly, for the reasons set forth below, the motion for summary judgment and the motion to dismiss are GRANTED.

# I.    BACKGROUND[1]

## A. The Merger Agreement

Plaintiffs are Michael Orlando and "other stockholders" of Fit Pay, Inc., a "contactless payment company." Def. 56.1 ¶ 2; Pl. 56.1 ¶¶ 13, 14. In May 2017, Plaintiffs sold Fit Pay to Defendant Nxt-ID, Inc. pursuant to a merger agreement. Def. 56.1 ¶ 5; *see* Pl. 56.1 ¶ 5 [ECF No. 114-6 ("Merger Agreement")]. Under the Merger Agreement, "Sellers" means Plaintiffs, and "Purchaser" means Nxt-ID. Merger Agreement at 1. The "Company" means Fit Pay.

The Merger Agreement provides that, from October 2017 through September 2021, "the Sellers shall be entitled to receive an Earnout Payment equal to 12.5% of the Gross Revenue." Merger Agreement § 2.3(b)(i). The Merger Agreement defines "Gross Revenue" broadly, "including . . . all gross revenue derived from Purchaser's use of the Company's technology . . . ." Merger Agreement § 1.1. After specifying, *inter alia*, that Gross Revenue should be calculated "prior to any deductions" based on, for example, administrative expenses, the Merger Agreement states: "For the avoidance of doubt, Gross Revenue shall include any revenue derived from any use by the Purchaser." Merger Agreement § 1.1.

The Merger Agreement sets out a detailed process for calculating the Earnout Payment based on the revenue that Fit Pay generated for Nxt-ID. It states that "each quarter during the Earnout Period, within five (5) days after the filing of the Purchaser's quarterly report on Form 10-Q with the SEC, Purchaser shall prepare and deliver to the Sellers its good faith calculation of Gross revenue for such quarter (the 'Gross Revenue Statement')." Merger Agreement

---

[1] The facts related to the motion for summary judgment are taken from the parties' Local Civil Rule 56.1 statements [ECF Nos. 108 ("Def. 56.1"), 113 ("Pl. 56.1")], the declarations submitted in connection with these motions, and the exhibits attached thereto [ECF Nos. 106, 114, 115, 117], including the Merger Agreement [ECF Nos. 106-4, 114-6 ("Merger Agreement")]. The facts related to Plaintiffs' motion to dismiss are taken from the Amended Counterclaims [ECF No. 84 ("AC")] and the contracts attached to the Amended Counterclaims and incorporated therein by reference, including Orlando's Employment Agreement [ECF No. 84-1 ("Employment Agreement")].

§ 2.3(b)(ii)(A).  The Merger Agreement then describes a mechanism for Plaintiffs and Nxt-ID to resolve any disputes about the calculation.  *See id.* § 2.3(b)(ii).

In a key provision, the Merger Agreement specifies that the Earnout Payment "shall not be modified or decreased if, in the future, there is an *internal* ownership, organizational or operational change within Purchaser."  Merger Agreement § 2.3(b)(iii)(B).  The Merger Agreement also specifies that Nxt-ID "shall not intentionally take any action or fail to take any action primarily for the purpose of reducing or eliminating the Earnout Payment."  Merger Agreement § 2.3(b)(iii)(A).  However, Nxt-ID did not "owe any duty . . . to maximize the Earnout Payment."  *Id*.  Rather, Nxt-ID was to make decisions "in light of normal business considerations."  *Id*.

**B.  Orlando's Relationship with Nxt-ID and the Sale of Fit Pay to Garmin**

Following the merger, Orlando became the President of Fit Pay and the Chief Operating Officer of Nxt-ID.  AC ¶ 12.  Nxt-ID alleges that Orlando's employment relationship with Nxt-ID was "governed by an Employment Contract and a Code of Business Conduct and Ethics."  AC ¶ 13 [ECF No. 84-1 ("Employment Agreement"); 84-2 ("Code of Conduct")].  However, the Employment Agreement states that the contracting parties are Orlando and Fit Pay.  Employment Agreement at 1; *see id.* § 1.1.  The Code of Conduct states that it "is not an employment contract."  Code of Conduct at 9.  Orlando also served on the Board of Directors of Nxt-ID from June 2017 until he resigned on February 28, 2020.  AC ¶¶ 21, 71.

Nxt-ID asserts that, before the merger, Orlando made "materially false" representations about "Fit Pay's then current business, business prospects and cash flow."  AC ¶ 9.  Nxt-ID further asserts that, after the merger, Orlando failed to disclose that those representations were false.  AC ¶¶ 79(a), 83(a).  According to Nxt-ID, Fit Pay fell far short of projected earnings, and Nxt-ID was required to invest millions of dollars to keep Fit Pay "alive."  AC ¶¶ 22–23, 25.

In the summer and fall of 2018, Nxt-ID planned to spin off Fit Pay as an independent company, with Orlando as CEO. AC ¶¶ 28–30. Nxt-ID alleges that Orlando initially supported the spin-off but his support "fade[d] when he concluded that the potential investors would not satisfy his projected cash needs" and that "a deflated management buyout offer would be more profitable for him." AC ¶ 38. Nxt-ID asserts, without explanation, that the spin-off failed "[a]s a direct result" of Orlando's lack of support. *Id*.

Meanwhile, "Nxt-ID's senior lender" decided to "discontinue its lending relationship with Nxt-ID." AC ¶ 32. In May 2019, Nxt-ID entered into a loan agreement with CrowdOut Capital. AC ¶¶ 33. The loan required Nxt-ID to quickly sell Fit Pay. *See id.*

In July 2019, Orlando presented a proposed management buyout ("MBO"), valued at approximately $3 million, which Nxt-ID rejected. AC ¶¶ 42, 43. In August 2019, Nxt-ID officially "failed to effect the Spin-Off." AC ¶ 39. Shortly thereafter, Garmin "offer[ed] to buy Fit Pay for $3 million based on negotiations with Orlando." AC ¶ 46.

Garmin was the "most important customer" of the Fit Pay technology by a large margin. AC ¶ 44. Nxt-ID alleges that, beginning "[s]ometime in 2019," Orlando, "independently and without the Nxt-ID Board of Directors' approval, entered into independent negotiations with Garmin for Garmin to purchase Fit Pay." AC ¶ 45. Nxt-ID alleges that it "deemed" the $3 million offer from Garmin "unacceptably low" and, therefore, considered "auctioning Fit Pay on the open market." AC ¶ 47.

Nxt-ID alleges that Orlando took several steps to push the Garmin deal ahead for "selfish purposes," seeking "to insinuate himself within Garmin" while "undermining the effort of Nxt-ID to achieve the best disposition" for Fit Pay. AC ¶ 52. In particular, Nxt-ID alleges that Orlando disclosed "confidential information to Garmin, including information respecting Nxt-ID's

contemplated auction." AC ¶ 48.  Nxt-ID further alleges that Orlando "falsely represent[ed] to Nxt-ID's Board" that Garmin "would inform any prospective purchasers that [Garmin] would not do business with anyone who purchased Fit Pay's technology" from Nxt-ID.  AC ¶ 51.

However, Nxt-ID also alleges that Orlando opposed the Garmin deal in several ways.  In August 2019, "Orlando, by his counsel Wilmer Hale, submitted a letter to Nxt-ID" stating that the proposed deal would violate the Merger Agreement.  AC ¶ 55.  He "voiced the same opinion to Garmin." AC ¶ 56.  Moreover, "Orlando voted against the Garmin [deal]," even though it provided that he would have a position as an "executive advisor" at Garmin.  AC ¶¶ 60, 63.

The Board of Nxt-ID voted to approve the Garmin deal, and Nxt-ID sold all shares of Fit Pay to Garmin for $3.2 million in September 2019.  AC ¶¶ 60, 61.  After Orlando's letter stating that the Garmin deal would violate the Merger Agreement, Garmin had "insisted that Nxt-ID agree to indemnify it, including for its legal fees, should Orlando assert a claim against it for the Earnout Payments." AC ¶ 58.  When the sale was "imminent," Orlando sent another letter to Nxt-ID, demanding payment of a promissory note and unpaid Earnout Payments. AC ¶ 66.  After the sale, Orlando sent another letter to Nxt-ID stating that "the Garmin [deal] did not realize 'the full potential value of the Fit Pay business and exposed [Nxt-ID] and this Board to potential legal action.'" AC ¶ 69.

### C.  Procedural History

Plaintiffs initiated this action in February 2020, asserting claims against Nxt-ID, Garmin, and CrowdOut [ECF No. 1 ("complaint")].  Nxt-ID filed an answer and counterclaims, including several fraud claims against both Orlando and the other plaintiffs [ECF No. 34 ¶¶ 190–214]. Garmin and CrowdOut, on the other hand, filed letters requesting leave to move to dismiss the complaint [ECF Nos. 25, 27].  In an Order dated May 15, 2020, the Court granted Plaintiffs leave

to amend their complaint in response to the letters but stated that it would be Plaintiffs' last opportunity to amend [ECF No. 37].  Thereafter, based on the Court's obligation to satisfy itself that it has subject matter jurisdiction, the Court instructed Plaintiffs to further amend their pleading to properly allege diversity with respect to CrowdOut [ECF No. 64].  Plaintiffs then filed the Second Amended Complaint [ECF No. 66 ("SAC")], which is their operative pleading.

The Second Amended Complaint asserts one claim against Nxt-ID for breach of the Merger Agreement based on the failure to make Earnout Payments.  SAC ¶ 88.  The Second Amended Complaint also asserted various claims against Garmin and CrowdOut based on the termination of the Earnout Payments.  *See, e.g.*, SAC ¶¶ 91, 97, 103, 105, 108.  However, Garmin and CrowdOut previously moved to dismiss, and the Court granted those motions [ECF No. 122].

Meanwhile, Nxt-ID responded to Plaintiffs' Second Amended Complaint with an answer and counterclaims [ECF No. 71], and Plaintiffs moved to dismiss its counterclaims [ECF Nos. 72, 73, 74].  Plaintiffs stressed the insufficiency of the fraud claims against them.  Without first seeking leave to amend from the Court, Nxt-ID filed the Amended Counterclaims [ECF No. 84 ("AC")], which dropped the fraud claims.

In the Amended Counterclaims, Nxt-ID asserts four claims against Orlando.  First, Nxt-ID asserts a claim for breach of contract, alleging that Orlando violated his responsibilities to Nxt-ID under the Employment Agreement and Code of Ethics.  AC ¶¶ 72–76.  Second, Nxt-ID asserts a claim for breach of fiduciary duty, citing Orlando's position on its board of directors.  AC ¶¶ 77–80.  Third, Nxt-ID asserts a claim for negligent misrepresentation based on Orlando's alleged representations and omissions in connection with the merger and, later, sale to Garmin.  AC ¶¶ 81–86.  Finally, Nxt-ID asserts a claim for "prima facie tort," alleging that Orlando filed meritless claims against Garmin and CrowdOut in order to hurt Nxt-ID.  AC ¶¶ 87–94.

Plaintiffs moved to dismiss the Amended Counterclaims [ECF Nos. 88, 89 ("Pl. MTD"), 90].  Nxt-ID Opposed that motion [ECF No. 103 ("Nxt-ID Opp.")].  Plaintiffs filed a reply in further support of their motion to dismiss [ECF No. 109].

Nxt-ID moved for summary judgment on Plaintiffs' claim for breach of the Merger Agreement [ECF Nos. 105, 106, 107 ("Nxt-ID SJ Mem."), 108 ("Def. 56.1")].  Plaintiffs opposed that motion [ECF Nos. 112 ("Pl. SJ Opp."), 113 ("Pl. 56.1"), 114, 115].  Nxt-ID replied in further support of its motion for summary judgment [ECF Nos. 116, 117].

## II.    LEGAL STANDARDS

### A.  Summary Judgment

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, a court must grant a motion for summary judgment if the movant shows that there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law.  Fed. R. Civ. P. 56(c); *Huminski v. Corsones*, 396 F.3d 53, 69 (2d Cir. 2005).  In these circumstances, summary judgment "is properly regarded not as a disfavored procedural shortcut, but rather" the appropriate resolution. *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986).  Summary judgment may be appropriate where the moving party's case rests on an unambiguous contract.  *See Topps Co. v. Cadbury Stani S.A.I.C.*, 526 F.3d 63, 68 (2d Cir. 2008).

### B.  Motion To Dismiss

A motion to dismiss a counterclaim is evaluated under the same standard as a motion to dismiss a complaint.  *Ohr Somayach/Joseph Tanenbaum Educ. Ctr. v. Farleigh Int'l Ltd.*, 483 F. Supp. 3d 195, 202 (S.D.N.Y. 2020).  To survive a motion to dismiss for failure to state a claim, the pleading must allege "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (quoting *Bell Atl. Corp. v. Twombly*,

550 U.S. 544, 570 (2007)).  The pleading must raise "more than a sheer possibility that a [party] has acted unlawfully."  *Id.*

For purposes of Plaintiffs' motion to dismiss, the Court accepts as true the factual allegations in the Amended Counterclaims and draws all reasonable inferences in favor of Nxt-ID. *See Allaire Corp. v. Okumus*, 433 F.3d 248, 249–50 (2d Cir. 2006).  The Court also relies on the documents attached to the Amended Counterclaims and incorporated by reference, including the Employment Agreement [ECF No. 84-1].  *See ATSI Communications, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007).  The Court is "not required to credit conclusory allegations or legal conclusions." *Edwards v. Sequoia Fund, Inc.*, 938 F.3d 8, 12 (2d Cir. 2019).[2]

## C.  Contract Interpretation

"It is well settled that '[t]he threshold question in a dispute over the meaning of a contract is whether the contract terms are ambiguous.'"  *Krumme v. WestPoint Stevens Inc.*, 238 F.3d 133, 138 (2d Cir. 2000) (alteration in original) (quoting *Revson v. Cinque & Cinque, P.C.*, 221 F.3d 59, 66 (2d Cir. 2000)).  The determination whether a contract is ambiguous is a matter of law, as is the meaning of an unambiguous contract.  *Diesel Props. S.r.l. v. Greystone Bus. Credit II LLC*, 631 F.3d 42, 51 (2d Cir. 2011).  In determining whether a contract is ambiguous, a court must "read the integrated agreement 'as a whole.'"  *Lockheed Martin Corp. v. Retail Holdings, N.V.*, 639 F.3d 63, 69 (2d Cir. 2011) (quoting *Law Debenture Trust Co. of N.Y. v. Maverick Tube Corp.*, 595 F.3d 458, 468 (2d Cir. 2010)).

---

[2] Plaintiffs' counsel spends much of its briefing arguing that the Amended Counterclaims still sound in fraud and should, therefore, be dismissed for failure to satisfy the heightened pleading standard under Rule 9(b) of the Federal Rules of Civil Procedure.  Pl. MTD 1, 5–8, 12–13, 19–21.  This argument is not helpful because the Amended Counterclaims do not assert fraud claims.  Plaintiffs' reliance on *Rombach v. Chang*, 355 F.3d 164, 171 (2d Cir. 2004), which holds that Rule 9(b) applies to claims brought under Sections 11 and 12(a)(2) of the Securities Act, is obviously misplaced.  Nxt-ID originally asserted fraud claims, but then it adjusted its litigation strategy.  Plaintiffs' counsel needed to do the same.

Contract language is unambiguous if there is only one reasonable interpretation of the agreement. *See id.* at 69. "The words and phrases in a contract should be given their plain meaning, and the contract should be construed so as to give full meaning and effect to all of its provisions." *Chesapeake Energy Corp. v. Bank of N.Y. Mellon Trust Co.*, 773 F.3d 110, 114 (2d Cir. 2014) (alterations omitted) (quoting *Olin Corp. v. Am. Home Assur. Co.*, 704 F.3d 89, 99 (2d Cir. 2012)). In the absence of ambiguity, a court may not consider extrinsic evidence of the parties' intentions or understanding. *Id.* at 71 (citing *Int'l Klafter Co. v. Cont'l Cas. Co.*, 869 F.2d 96, 100 (2d Cir. 1989)).

### III.     DISCUSSION

#### A.  Nxt-ID Did Not Breach the Merger Agreement.

Plaintiffs assert one claim against Nxt-ID for breach of the Merger Agreement because Nxt-ID stopped making Earnout Payments to Plaintiffs after it sold Fit Pay to Garmin. *See* SAC ¶ 88; Def. 56.1 ¶ 3; Pl. 56.1 ¶ 3. Nxt-ID seeks summary judgment, arguing that the Merger Agreement unambiguously did not obligate Nxt-ID to make Earnout Payments after Nxt-ID sold Fit Pay to another company and, therefore, no longer derived any revenue from the Fit Pay technology. Nxt-ID is entitled to summary judgment.

The Merger Agreement expressly mentions that Plaintiffs' right to receive an Earnout Payment from Nxt-ID could "not be modified or decreased if, in the future, there is an *internal* ownership, organizational or operational change within" Nxt-ID. Merger Agreement § 2.3(b)(iii)(B) (emphasis added). The Merger Agreement does not say anything about a sale to an external third party. The principle of *expressio unius est exclusio alterius* suggests that the sale of Fit Pay could end the obligation of Nxt-ID to make Earnout Payments. *See VKK Corp. v. Nat'l Football League*, 244 F.3d 114, 130 (2d Cir. 2001). It is undisputed that Nxt-ID did not terminate

the Earnout Payment as a result of an *internal* change in ownership or leadership, but only after it sold Fit Pay to Garmin.  Def. 56.1 ¶ 10; *see* Pl. 56.1 ¶¶ 10, 76.

The principle of *expressio unius est exclusio alterius* instructs that the express mention of a particular circumstance may support the inference that another circumstance, "left unmentioned," is "meant to be excluded."  *See N.L.R.B. v. SW Gen., Inc.*, ___ U.S. ___, 137 S. Ct. 929, 940 (2017); see also *VKK Corp.*, 244 F.3d at 130 (applying the principle when interpreting a contract under New York law); *Cornell Univ. v. UAW Local 2300*, 942 F.2d 138, 139 (2d Cir. 1991); *Israel Discount Bank, Ltd. v. Gottesman*, 544 F.2d 80, 82 (2d Cir. 1976). Whether it is sensible to infer the exclusion of the unmentioned circumstance depends on context.  *See Marx v. General Revenue Corp.*, 568 U.S. 371, 381 (2013).  In the context of the Merger Agreement, it is eminently sensible to infer that the sale of Fit Pay to an external third party would impact Plaintiffs' right to receive Earnout Payments from Nxt-ID.

Plaintiffs contend that Nxt-ID was required to pay them 12.5% of "'all revenue derived from [Fit Pay] Technology,' with no qualifications or limitations," including whether or not Nxt-ID derived any revenue from Fit Pay.  Pl. SJ Opp. at 4.  That is not what the Merger Agreement says, and it does not make sense. On the contrary, the Merger Agreement set forth a detailed process for calculating the Earnout Payments based on the revenue that Nxt-ID derived from Fit Pay.  It defines "Gross Revenue" to include "any revenue derived from any use *by the Purchaser*," after defining "Purchaser" as Nxt-ID.  Merger Agreement § 1.1 (emphasis added); *accord id.* ("all gross revenue derived *from Purchaser's* use of the Company's technology) (emphasis added).  The Merger Agreement also explains that the calculation requires Nxt-ID to "prepare" a "Gross Revenue Statement" based on internal financial information.  Merger Agreement § 2.3(b)(ii)(A).

Nxt-ID could not prepare the requisite Gross Revenue Statement to calculate the Earnout Payment once Garmin owned the Fit Pay technology.

Plaintiffs attempt to cast the Merger Agreement as an ironclad promise by Nxt-ID to pay Plaintiffs during the Earnout Period no matter what. The Merger Agreement, however, expressly contemplates the possibility that Nxt-ID might take some action that eliminates the Earnout Payment. It specifies that Nxt-ID could not "*intentionally* take any action . . . *primarily* for the purpose of reducing or eliminating the Earnout Payment." Merger Agreement § 2.3(b)(iii)(A) (emphasis added). The Merger Agreement further provides that Nxt-ID was not obliged to act primarily to preserve or maximize the Earnout Payment. *Id.* Rather, Nxt-ID was to make decisions "in light of normal business considerations." *Id.*

Plaintiffs do not allege that Nxt-ID sold Fit Pay to Garmin primarily for the purpose of eliminating the Earnout Payment. Rather, it is undisputed that Nxt-ID sold Fit Pay because Nxt-ID was in dire financial condition and was required to sell Fit Pay as a condition of the loan from CrowdOut. *See* Pl. 56.1 ¶ 56 ("The CrowdOut Loan required the complete spin-off or sale of Fit Pay within 60 days, after which Nxt-ID was forced to sell Fit Pay."). In other words, there is no dispute that Nxt-ID sold Fit Pay for normal business reasons.

Taking the contract as a whole, the Merger Agreement unambiguously did not oblige Nxt-ID to continue paying Plaintiffs after Nxt-ID sold Fit Pay. Plaintiffs argue that they never contemplated the "possibility that Nxt-ID would sell Fit Pay to a third party during the four-year earnout period" and "would not have agreed to the Merger Agreement" if they thought Nxt-ID could terminate the Earnout Payments through a future transaction. Pl. 56.1 ¶¶ 30, 32. In the absence of ambiguity in the language of the Merger Agreement, however, "any conceptions or

understandings any of the parties may have had" are "immaterial and inadmissible." *Int'l Klafter*,
869 F.2d at 100.  Nxt-ID is entitled to summary judgment.

**B.  Nxt-ID Fails To State a Claim for Breach of Contract.**

Nxt-ID alleges in its Amended Counterclaims that the Employment Agreement and Code
of Conduct governed Orlando's employment and that Orlando breached these contracts in several
ways.  Nxt-ID argues that the Employment Agreement and Code of Conduct required Orlando to
act in the best interest of Nxt-ID and that, instead, Orlando pursued his own interests at the expense
of Nxt-ID when he "effectively killed the Spin-Off" and "interfered with the auction process" to
find a buyer, other than Garmin, for Fit Pay.  Nxt-ID Opp. at 10.  However, Nxt-ID fails to allege
the existence of a valid, enforceable contract between Orlando and Nxt-ID.

The parties agree that Delaware law governs the contract claims that Nxt-ID asserts.  *See*
Employment Agreement § 6.2 (selecting Delaware as governing law); *Ministers & Missionaries
Ben. Bd. v. Snow*, 814 F.3d 130, 131 (2d Cir. 2016) ("[W]hen parties include a choice-of-law
provision in a contract, they intend that the law of the chosen state—and no other state—will be
applied."); Pl. MTD at 19 & n.13; Nxt-ID Opp. at 9–12.  To state a claim for breach of contract
under Delaware law, a plaintiff must allege (1) the existence of a contract between the parties, (2)
breach of an obligation imposed by that contract, and (3) damages.  *See VLIW Tech., LLC v.
Hewlett-Packard Co.*, 840 A.2d 606, 612 (Del. 2003); *NAMA Holdings, LLC v. Related World Mkt.
Ctr., LLC*, 922 A.2d 417, 434 (Del. Ch. 2007) ("As a general rule, only parties to a contract and
intended third-party beneficiaries may enforce an agreement's provisions"); *Kronenberg v. Katz*,
872 A.2d 568, 605 n.74 (Del. Ch. 2004) ("Of course, a nonparty to a contract ordinarily has no
rights under that contract.  The exception is when the nonparty can demonstrate that it was a third-
party beneficiary of the contract.").

Nxt-ID is not a party to the Employment Agreement.  The Employment Agreement is a contract "by and between Fit Pay, Inc Subsidiary of Nxt-ID . . . and Michael J. Orlando." Employment Agreement at 1.  The Employment Agreement states that the "the Parties" are Fit Pay and Orlando.  *Id.*  It defines "the 'Company'" referenced throughout the Employment Agreement as Fit Pay.  *Id.*  It defines Nxt-ID as "the Company's parent company (the 'Parent')."  *Id.* § 1.1. The Employment Agreement contemplates that "any Party hereto" might "bring an action . . . to enforce its rights under this Agreement."  *Id.* § 6.8; *see id.* §§ 6.7, 6.9.  It further provides: "This Agreement shall constitute a binding obligation of the Company and any *successor* thereto."  *Id.* § 6.13 (emphasis added).

Nxt-ID is not Fit Pay.  Nxt-ID is not a successor to Fit Pay.  Moreover, Nxt-ID has failed to allege that it was an intended beneficiary of the Employment Agreement between Fit Pay and Nxt-ID.  *See Kronenberg*, 872 A.2d at 605.  Instead, in its Amended Counterclaims and in its brief, Nxt-ID inaccurately inserts its own name where the Employment Agreement describes Orlando's obligations to Fit Pay and the obligations of the parties to the Employment Agreement.  *Compare* AC ¶¶ 15, 17, 73, 76, *with* Employment Agreement §§ 2.4, 6.7, 6.8.  For example, Nxt-ID alleges that "Section 2.4 of the Employment Agreement obligated Orlando to 'use his best efforts to promote the interests of [Nxt-ID].'"  AC ¶ 15 (alteration in original).  However, Section 2.4 of the Employment Agreement states that Orlando "will use his best efforts to promote the interest of the Company," *i.e.*, Fit Pay.  Employment Agreement § 2.4.  Accordingly, Nxt-ID cannot enforce the provisions of the Employment Agreement.  *See NAMA Holdings*, 922 A.2d at 434.

Nxt-ID fares no better with alleged breaches the Code of Conduct.  "Under Delaware law, employee handbooks or written best practices are not given the binding effect of a contract absent clear language in the handbook to the contrary."  *Witzke v. Kent Cty. Soc'y for Prevention of Cruelty*

*to Animals, Inc.*, 2014 WL 4298210, at *2 (Del. Super. Ct. Aug. 29, 2014). Far from providing a clear statement that it should be treated as a contract, the Code of Conduct confirms that it "is not an employment contract." Code of Conduct at 9. As such, the Court dismisses the counterclaims for breach of contract.

## C. Nxt-ID Fails To State a Claim for Negligent Misrepresentation.

To state a claim for negligent misrepresentation, Nxt-ID must allege that (1) Orlando "had a duty, as a result of a special relationship, to give correct information"; (2) Orlando "made a false representation" that he "should have known was incorrect"; (3) "the information supplied in the representation was known by [Orlando] to be desired by [Nxt-ID] for a serious purpose"; (4) Nxt-ID "intended to rely and act upon it"; and (5) Nxt-ID "reasonably relied" on the information to its "detriment." *Anschutz Corp. v. Merrill Lynch & Co.*, 690 F.3d 98, 114 (2d Cir. 2012) (quoting *Hydro Investors, Inc. v. Trafalgar Power Inc.*, 227 F.3d 8, 20 (2d Cir. 2000)). Nxt-ID must also allege that the misrepresentations were the proximate cause of its loss. *Herrick v. Grindr*, LLC, 306 F. Supp. 3d 579, 598 (S.D.N.Y. 2018).

Nxt-ID fails to state a claim for negligent misrepresentation. In particular, Nxt-ID alleges that, before the merger, Orlando made "materially false" representations about "Fit Pay's then current business, business prospects and cash flow." AC ¶ 9. These allegedly false statements before the merger cannot support a claim for negligent misrepresentation because there was no special relationship between Orlando and Nxt-ID at that time. *See Anschutz*, 690 F.3d at 114–15 ("New York strictly limits negligent misrepresentation claims to situations involving 'actual privity of contract between the parties or a relationship so close as to approach that of privity.'" (quoting *In re Time Warner Inc. Sec. Litig.*, 9 F.3d 259, 271 (2d Cir. 1993)). Nxt-ID further alleged that, after the merger, Orlando failed to disclose that his pre-merger representations were false. AC ¶¶

79(a), 83(a).  This alleged omission also falls far short.  Nxt-ID has not alleged what facts Orlando should have disclosed, nor how Nxt-ID "reasonably relied" on the purported omission.  *Anschutz*, 690 F.3d at 114; *see ICD Capital, LLC v. CodeSmart Holdings, Inc.*, 2020 WL 815733, at *5 (S.D.N.Y. Feb. 19, 2020).

Nxt-ID also alleges that Orlando disclosed "confidential information to Garmin, including information respecting Nxt-ID's contemplated auction" of Fit Pay.  AC ¶ 48.  This allegation cannot support a claim for negligent misrepresentation because, here, Nxt-ID fails to allege that Orlando made a "false representation."  *Anschutz*, 690 F.3d at 114; *see Sobel v. Eggleston*, 2013 WL 1344712, at *5 (S.D.N.Y. Mar. 28, 2013); s*ee also Mandarin Trading Ltd. v. Wildenstein*, 944 N.E.2d 1104, 1109 (N.Y. 2011) (explaining that an essential element of negligent misrepresentation is that "the information was incorrect").  Moreover, Nxt-ID cannot allege that it relied on information that Orlando allegedly supplied to Garmin.

Nxt-ID further alleges that Orlando "sought to dissuade Nxt-ID from auctioning Fit Pay by falsely representing to Nxt-ID's Board" that Garmin "would inform any prospective purchasers that [Garmin] would not do business with anyone who purchased Fit Pay's technology" from Nxt-ID.  AC ¶ 51.  However, Nxt-ID fails to offer any factual allegations to support the inference that Nxt-ID "relied" on this information to its "detriment."  *Anschutz*, 690 F.3d at 114.  In the Amended Counterclaims, Nxt-ID states: "The materiality of this assertion was enormous: who would buy a company whose most important customer had declared it would be a customer no more?"  AC ¶ 51.  But rhetorical questions are not factual allegations.  Nxt-ID never alleges that it actually was dissuaded from pursuing an auction based on Orlando's representation.  Furthermore, Nxt-ID never alleges that it suffered any loss, let alone that Orlando proximately caused such loss.  *See Herrick*, 306 F. Supp. 3d at 598.

**D. Nxt-ID Fails To State a Claim for Breach of Fiduciary Duty.**

Nxt-ID contends in its Amended Counterclaims that Orlando "breached his duty of loyalty by constantly advancing his own self-interest at the expense of Nxt-ID." Nxt-ID Opp. at 13. Under Delaware law, a claim for breach of fiduciary duty has two elements: (1) that a fiduciary duty existed and (2) that the defendant breached that duty. *Beard Research, Inc. v. Kates*, 8 A.3d 573, 601 (Del. Ch. 2010), *aff'd*, 11 A.3d 749 (Del. 2010). The duty of loyalty provides that corporate officers and directors "are not permitted to use their position" to "further their private interests" and that "the best interest of the corporation and its shareholders takes precedence." *In re Pattern Energy Grp. Inc. S'holders Litig.*, 2021 WL 1812674, at *47 (Del. Ch. May 6, 2021) (quoting *Cede & Co. v. Technicolor, Inc.*, 634 A.2d 345, 361 (Del. 1993)). As member of the Board of Directors of Nxt-ID, Orlando owed a duty of loyalty. However, Nxt-ID fails to state a claim for breach of that duty.

Nxt-ID first argues that Orlando breached his duty of loyalty by failing to disclose that his pre-merger representations about the financial prospects of Fit Pay were false. Nxt-ID Opp. at 14. Specifically, in the Amended Counterclaims, Nxt-ID alleges that, before the merger, Orlando made certain financial projections that turned out to be wrong and then asserts, after becoming a director, Orlando should have disclosed that his projections were "false." *See* AC ¶¶ 9, 22, 23, 79(a). These allegations fall far short of stating a claim for breach of the duty of loyalty. Orlando was not required to be correct in his pre-merger financial projections, and Nxt-ID does not explain what Orlando should have disclosed after the merger.[3]

---

[3] In this instance Plaintiffs' counsel is correct that, if Nxt-ID sought to allege that Orlando defrauded Nxt-ID about the financial prospects of Fit Pay, Nxt-ID was required to meet a heightened pleading standard. *See Lewis v. Ward*, 2003 WL 22461894, at *4 (Del. Ch. Oct. 29, 2003) ("[W]hen a breach-of-fiduciary-duty claim is premised on an accusation of fraud, this court has examined the complaint against the particularized pleading standard of Rule 9(b)."). Nxt-ID clearly fails to meet that heightened standard.

Nxt-ID also argues that Orlando breached the duty of loyalty by pursuing the Garmin deal. Nxt-ID Opp. at 15–17. Nxt-ID asserts that Orlando sought to advance his own interests while undermining the interest of Nxt-ID in obtaining the best price for Fit Pay. However, the confused allegations in the Amended Counterclaims fail plausibly to allege that Orlando used his position either to benefit himself, or to harm Nxt-ID. *See CVC Claims Litig. LLC v. Citicorp Venture Capital Ltd.*, 2007 WL 2915181, at *4 (S.D.N.Y. Oct. 4, 2007) (dismissing duty of loyalty claim where plaintiff did not allege director "participated in any transaction or corporate decision" that adversely harmed the company "but that benefited him"); *In re BJ's Wholesale Club, Inc. S'holders Litig.*, 2013 WL 396202, at *5, *15 (Del. Ch. Jan. 31, 2013). Nxt-ID offers only conclusory allegations that Orlando stood to benefit from advancing the Garmin deal. Furthermore, Nxt-ID cannot plausibly allege that Orlando was acting against its interests by pursing a deal that the Board of Nxt-ID later approved over Orlando's objection.

The Court has carefully considered all of the allegations in the Amended Counterclaims, as well as the arguments in the briefs. The Court concludes that Nxt-ID fails to state a claim for breach of fiduciary duty. Accordingly, this counterclaim is dismissed.

**E. Nxt-ID Fails To State a Claim for Prima Facie Tort.**

Nxt-ID asserts a claim for prima facie tort against Orlando based on his filing of claims against Garmin and CrowdOut. Specifically, in the Amended Counterclaims, Nxt-ID alleges that "by asserting these frivolous claims, Orlando has activated . . . indemnity provisions" that require Nxt-ID to pay "litigation expenses" to Garmin and CrowdOut. AC ¶¶ 90, 94. Nxt-ID asserts that Orlando "was familiar" with these indemnity provisions, he had "no expectation of recovering against either Garmin or CrowdOut," and, therefore, "Orlando's motivation in asserting claims against them was necessarily to cause injury to Nxt-ID." AC ¶¶ 90, 91. Finally, Nxt-ID asserts

that Orlando's claims against Garmin and CrowdOut were "a manifestation of disinterested malevolence." AC ¶ 92.

The parties appear to agree that New York law governs the counterclaim for prima facie tort. *See* Pl. MTD at 23–25; Nxt-ID Opp. at 24–25. The elements are: (1) intentional infliction of harm; (2) resulting in special damages; (3) without excuse or justification; (4) by an act that is otherwise lawful. *Curiano v. Suozzi*, 63 N.Y.2d 113, 117, 469 N.E.2d 1324, 1327 (N.Y. 1984). This cause of action is "highly disfavored in New York." *Nevin v. Citibank, N.A.*, 107 F. Supp. 2d 333, 347 (S.D.N.Y. 2000). In particular, "New York courts have consistently refused to allow retaliatory lawsuits based on prima facie tort predicated on the malicious institution of a prior civil action." *Curiano*, 63 N.Y.2d at 118 (collecting cases); *see also Margrabe v. Sexter & Warmflash, P.C.*, 07-cv-2798 (KMK), 2009 WL 361830, at *8 (S.D.N.Y. Feb. 11, 2009), *aff'd*, 353 F. App'x 547 (2d Cir. 2009).

"The touchstone" of a claim for prima facie tort "is 'disinterested malevolence,' meaning that the plaintiff cannot recover unless the defendant's conduct was not only harmful, but done with the sole intent to harm." *Twin Laboratories, Inc. v. Weider Health & Fitness*, 900 F.2d 566, 571 (2d Cir. 1990) (quoting *Burns Jackson Miller Summit & Spitzer v. Lindner*, 59 N.Y.2d 314, 333, 451 N.E.2d 459, 468 (N.Y. 1983)). Allegations that evince "motives other than disinterested malevolence, 'such as profit, self-interest, or business advantage' will defeat a prima facie tort claim." *Twin Labs*, 900 F.2d at 571 (quoting *Marcella v. ARP Films, Inc.*, 778 F.2d 112, 119 (2d Cir. 1985)); *see Squire Records Inc. v. Vanguard Recording Soc., Inc.*, 25 A.D.2d 190, 192, 268 N.Y.S.2d 251, 254 (1st Dep't 1966) ("the gist of the complaint is that Vanguard" acted "for its own profit and self-interest"), *aff'd*, 19 N.Y.2d 797, 226 N.E.2d 542 (1967); *see also, e.g., Margrabe*, 2009 WL 361830, at *8 ("Plaintiff pleads herself out of this cause of action" with accusations

about the defendants' motives); *Daniels v. St. Luke's-Roosevelt Hosp. Ctr.*, 2003 WL 22410623, at *6 (S.D.N.Y. Oct. 21, 2003) (nothing to support "assertion that the sole motivation . . . was 'disinterested malevolence'").

The factual allegations in the Amended Counterclaims defeat any claim for prima facie tort. The "gist" of the Amended Counterclaims is that Orlando was, at all times, motivated by his own "self-interest." *Squire Records*, 25 A.D.2d at 192; *see* AC ¶ 1 ("By these Counterclaims, Nxt-ID seeks damages flowing from Orlando's . . . effort[s] to advance his own self-interest."); *see also id.* ¶¶ 40, 42, 49, 56, 60 (alleging that Orlando voted against the Garmin based on "pure self-interest" because he knew the Earnout Payments "would not . . . survive"), 64, 70, 79(g). Nxt-ID specifically alleges that when Orlando threated legal action, he was seeking "immediate payment" of a promissory note and continued receipt of the Earnout Payments after the Garmin deal. AC ¶¶ 66. Indeed, Nxt-ID labeled the portion of its allegations about the incipient legal action with the heading "Orlando Pursues His Own Interest and Threatens to Sue Nxt-ID." *Id*. at 11.

The assertions that Orlando's claims against Garmin and CrowdOut were "frivolous" and that Orlando could have "no expectation of recovering" carry no weight. AC ¶¶ 90–94. They are legal conclusions couched as factual allegations. *Iqbal*, 556 U.S. at 678. The wholly conclusory assertion that the claims were "a manifestation of disinterested malevolence" is belied by the detailed factual allegations that Orlando was motivated by money or other self-interest. AC ¶ 92; *see Edwards*, 938 F.3d at 12. Accordingly, Nxt-ID fails to state a claim for prima facie tort.

For all of the reasons set forth above, the Amended Counterclaims are dismissed, and the dismissal is with prejudice. In opposing Plaintiffs' motion to dismiss the Amended Counterclaims, Nxt-ID has not asked for leave to amend further. In any event, to the extent that any further amendment would not be futile, the Court exercises its discretion not to permit such further

amendment.  *See GEOMC Co. v. Calmare Therapeutics Inc.*, 918 F.3d 92, 101 (2d Cir. 2019) (discussing the court's discretion on a motion to dismiss counterclaims after a counterclaimant has filed an amended answer without seeking leave).

## IV.    CONCLUSION

For the reasons set forth above, the motion of Defendant Nxt-ID for summary judgment [ECF No. 105] is GRANTED.  Plaintiffs' motion to dismiss the counterclaims asserted by Nxt-ID [ECF No. 88] is GRANTED.  The Clerk of Court is respectfully directed to terminate the motions pending at docket entries 88 and 105 and to close this case.

**SO ORDERED.**

Date:  **March 31, 2022**
        **New York, NY**                            **MARY KAY VYSKOCIL**
                                                     **United States District Judge**

20